# 15-CR-588

## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF NEW YORK
────────────◆────────────

### AHMED EL GAMMAL,

**Petitioner,**

**-against-**

### UNITED STATES OF AMERICA

**Respondent,**

────────────◆────────────

## MEMORANDUM IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS

SARAH KUNSTLER, ESQ.
BEENA AHMAD, ESQ.
LAW OFFICES OF SARAH KUNSTLER
*Attorney for Petitioner*
*Ahmed El Gammal*
315 Flatbush Avenue #103
Brooklyn, NY  11217
(718) 783-3682
(347) 402-2014
sarah@kunstlerlaw.net

**TABLE OF CONTENTS**

*INTRODUCTION* .................................................................................................................. *1*

*STATEMENT OF FACTS* ...................................................................................................... *2*

    a.   The Trial .......................................................................................................... 3

    b.   Conscious Avoidance ................................................................................... 14

    c.   The Court's Instructions on Counts Three and Four .................................... 15

    d.   The Jury's Deliberation/Mr. El Gammal's Conviction ................................ 16

    e.   The Appointment of New Counsel for Mr. El Gammal ............................... 16

    f.   The Terrorism Sentencing Enhancements ................................................... 17

    g.   The Appropriate Sentence on Count Three .................................................. 18

    h.   Probation's Calculation of the Guidelines and Sentencing Recommendation ................. 18

    i.   The Sentencing .............................................................................................. 19

    j.   The Appeal .................................................................................................... 21

*SUMMARY OF ARGUMENT* .............................................................................................. *21*

*ARGUMENT* ........................................................................................................................... *23*

**I.   MR. EL GAMMAL'S APPELLATE COUNSEL WAS INEFFECTIVE FOR
FAILING TO CHALLENGE MR. EL GAMMAL'S CONVICTIONS ON COUNTS
THREE AND FOUR ON THE GROUNDS OF INSUFFICIENCY ...................................... 23**

    A. Governing Law ............................................................................................ 23

    B.   The Evidence Was Insufficient to Convict Mr. El Gammal on Count Three, for Aiding
and Abetting the Receipt of Military-Type Training from a Foreign Terrorist Organization .. 28

    C.   The Evidence Was Insufficient to Convict Mr. El Gammal on Count Four, for Conspiring
to Have Another Person Receive Military-Type Training from a Foreign Terrorist
Organization ....................................................................................................... 27

    D.   Mr. El Gammal's Appellate Counsel's Failure to Make an Insufficiency Argument on
Appeal with Respect to Counts Three and Four Constituted Ineffective Assistance of Counsel
    28

**II.   MR. EL GAMMAL'S APPELLATE COUNSEL WAS INEFFECTIVE FOR
FAILING TO CHALLENGE THE PROCEDURAL ERROR THAT RESULTED FROM
THE APPLICATION OF SENTENCING ENHANCEMENTS U.S.S.G. §§ 3A4.1 and
2M5.3 (b)(1) ........................................................................................................................... 30**

    A. Governing Law ............................................................................................ 30

    B.   The U.S.S.G. § 3A4.1 Enhancement Does Not Apply Where the Underlying Conduct Is
Not Aimed at Any Particular Government ......................................................... 31

    C.   The U.S.S.G. § 2M5.3 (b)(1) Enhancement Does Not Apply Because the Evidence Does
Not Show that Any Material Support Would Be in Furtherance of a Violent Act. ................. 37

    D.   Mr. El Gammal's Appellate Counsel's Failure to Raise Challenges to U.S.S.G. §§ 3A4.1
and 2M5.3 (b)(1) on Appeal Constituted Ineffective Assistance of Counsel ..................... 39

*CONCLUSION* ....................................................................................................................... *41*

**TABLE OF AUTHORITIES**

**Cases**

*Armienti v. United States*, 234 F.3d 820 (2d Cir. 2000) .................................................... 24
*Cobb v. United States*, No. 04-CR-203 (ARR), 2019 WL 2607002 (E.D.N.Y. Jan. 11, 2019)........ 39
*Cuoco v. United States*, 208 F.3d 27 (2d Cir. 2000)........................................................... 23
*Gall v. U.S.,* 552 U.S. 38 (2007)........................................................................................ 30
*Glover v. United States,* 531 U.S. 198, 203 (2001) ........................................................... 39
*Johnson v. United States*, 313 F.3d 815 (2d Cir. 2002) ...................................................... 39
*Martin v. United States*, 834 F.Supp.2d 115 (E.D.N.Y. 2011)............................................ 24
*Mayo v. Henderson*, 13 F.3d 528 (2d. Cir. 1994) ........................................................ 24, 39
*Michel v. Louisiana*, 350 U.S. 91  (1955)........................................................................... 24
*Murray v. Carrier*, 477 U.S. 478 (1986)............................................................................ 30
*Puglisi v. United States*, 586 F.3d 209 (2d Cir. 2009)......................................................... 24
*Reed v. Farley*, 512 U.S. 339 (1994) ................................................................................. 30
*See Skaftouros v. United States*, 667 F.3d 144 (2d Cir. 2011).............................................. 23
*Strickland v. Washington*, 466 U.S. 668 (1984). ............................................... 23, 24, 40, 41
*U.S. v. Cavera*, 550 F.3d 180 (2d Cir. 2008)...................................................................... 30
*United States v. Alcius*, 952 F.3d 83 (2d Cir. 2020), *cert. denied*, —— U.S. ——, 141 S. Ct. 296, —
   –L.Ed.2d —— (2020).................................................................................................... 25
*United States v. Alhaggagi, 973 F.3d 693 (9th Cir. 2020)* ......................................... 33, 36
*United States v. Allen*, 127 F.3d 260 (2d Cir. 1997)............................................................ 25
*United States v. Arcila Ramirez*, 16 F.4th 844  (11th Cir. 2021)......................................... 33
*United States v. Awan*, 607 F.3d 30 (2d Cir. 2010) ........................................... 17, 18, 32, 34
*United States v. Banol-Ramos*, 516 F. App'x 43 (2d Cir. 2013)......................................... 32
*United States v. Bokun*, 73 F.3d 8 (2d Cir.1995) ............................................................... 23
*United States v. Bramer*, 956 F.3d 91 (2d Cir. 2020) ........................................................ 25
*United States v. Chu*, 714 F.3d 742 (2d Cir. 2013)............................................................. 30
*United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013). .......................................................... 25
*United States v. Dhirane*, 896 F.3d 295 (4th Cir. 2018)..................................................... 37
*United States v. El Gammal*, 831 F. App'x 539 (2d Cir. 2020) .......................................... 40
*United States v. Kabir*, 828 F. App'x 396 (9th Cir. 2020) ............................................ 26, 27
*United States v. Pabon-Cruz*, 391 F.3d 86 (2d Cir. 2004)................................................... 18
*United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012), as amended (Nov. 15, 2012)................... 32
*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2008)..................................................... 17, 32
*United States v. Temple*, 447 F.3d 130 (2d Cir. 2006)........................................................ 25
*United States v. Workman*, 110 F.3d 915 (2d Cir.1997)...................................................... 24
*Wainwright v. Sykes*, 433 U.S. 72 (1977) .......................................................................... 30

**INTRODUCTION**

On December 18, 2018, Petitioner Ahmed El Gammal was convicted of four counts: providing material support or resources to a foreign terrorist organization, in violation of 18 U.S.C. 2339B (Count One); conspiring to provide material support or resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Count Two); aiding and abetting the receipt of military-type training from a foreign terrorist organization, in violation of 18 U.S.C. § 2339D and 2 (Count Three); and conspiring to have another person receive military-type training from a foreign terrorist organization, in violation of 18 U.S.C. 371 and 2339D (Count Four).

Your Honor sentenced Petitioner to 144 months' imprisonment on Counts One and Two, 120 months' imprisonment on Count Three, and 60 months' imprisonment on Count Four, all to run concurrently.

Petitioner appealed his conviction, which was affirmed by the Second Circuit by summary order on October 26, 2020. Mr. El Gammal then made a motion for rehearing, which was denied on December 4, 2020.

Under the COVID rules in effect at the time of the Circuit's denial of Mr. El Gammal's appeal, his conviction became final 150 days after the Second Circuit issued its order[1], which was May 3, 2021. Accordingly, the deadline for Mr. El Gammal to file a petition for habeas corpus under section 2255 is May 3, 2022.

This memorandum is submitted by counsel in support of the Petitioner's 2255 petition, in which he raises the following claims:

---

[1] See https://www.supremecourt.gov/orders/courtorders/031920zr_d1o3.pdf. The COVID rules were rescinded in July of 2021, but still apply to cases in which the relevant lower court judgment, order denying discretionary review, or order denying a timely petition for rehearing was issued before July 19, 2021. See https://www.supremecourt.gov/announcements/COVID-19_Guidance_July_2021.pdf

(1)     Whether Mr. El Gammal's Appellate counsel was ineffective for failing to challenge Mr. El Gammal's conviction on Counts Three and Four?

(2)     Whether Mr. El Gammal's Appellate counsel was ineffective for failing to challenge the 12-point enhancement under U.S.S.G. § 3A4.1 and the two-point enhancement under U.S.S.G. § 2M5.3?

## STATEMENT OF FACTS

In 2014, Ahmed El Gammal, a naturalized United States citizen who immigrated from Egypt in 1997, owned and operated a used car dealership in Phoenix, Arizona. He was a supporter of the Arab Spring and the hope of democracy that the protests brought to his native country. His interest in the politics of that region led him to spend much of his free time on Facebook, participating in discussions about Egypt. It was through these online activities that Mr. El Gammal began communicating with Samy El-Goarany ("Samy"), a U.S. citizen who attended college in New York City.

In January of 2015, Samy left New York and flew to Turkey. From Turkey he traveled to Syria where he joined ISIS[2] and received religious and military training. Ten months later, in November of 2015, his family received an electronic message with an attached photograph of a letter from Samy stating that, if received, it meant that Samy had died "a martyr."

The government pursued a case against Mr. El Gammal in connection with Samy's conduct based on online communications between the two men. The government's evidence at trial consisted largely of electronic records: information found on Petitioner's computer that was seized at the time of his arrest, messages on various internet platforms, and posts on various websites and "social media."

---

[2] Although it is denoted by other names as well, we use the acronym "ISIS" to refer to the terrorist organization operating as the "Islamic State" in Syria (and elsewhere).

From these records, and evidence that circumstantially established a brief in-person interaction with Samy when Mr. El Gammal visited New York in October of 2014, the government sought to prove that Petitioner had facilitated Samy becoming a member of, and soldier for, ISIS. Specifically, the government contended that Mr. El Gammal arranged for Attia Aboualala ("Aboulalala"), an Egyptian journalist based in Turkey, to help Samy cross the Syrian border into ISIS-controlled territory. Mr. El Gammal did not dispute that he assisted Samy, who had never before traveled to Turkey, by putting him in touch with Aboualala, but contended that the government had not shown that he understood that Samy was going to the Turkish-Syrian border for any purpose other than to participate in humanitarian undertakings.

Notably, the government focused all its efforts on prosecuting Mr. El Gammal, while granting immunity to various family members who had more directly provided Samy aid or lied to federal agents about their knowledge of his whereabouts in Syria. These family members testified at trial as the government's witnesses pursuant to non-prosecution agreements with the government.

After three and a half days of deliberation, the jury reached a verdict of guilty on all four counts.

### a. The Trial

At trial, the Petitioner was represented by Federal Defenders of New York. Trial commenced on January 9, 2017. The government called nineteen witnesses; the defense called eight.

**The Testimony of Komaal Collie**

Komaal Collie was a special agent of the State Department who served as the government's main case agent. As well as providing a narrative of his direct involvement in the investigation, arrest, and obtaining of various search warrants, he testified extensively about

3

evidence derived from internet platforms (principally Facebook) pursuant to search warrants. [TT 102 *et seq.*] Evidence that was introduced through Agent Collie includes:

- Facebook records obtained pursuant to search warrants for accounts associated with Mr. El Gammal[3], Samy[4], and Aboualala[5];

- Evidence contained in Samy's Twitter account created after he reached Syria [GX 301];

- Evidence obtained from El Gammal's electronic devices seized by the government pursuant to a post-arrest search warrant, including videos GX 11 through 13 and 15];

- Photos, screenshots, and videos made by the agent during the course of his investigation [GX 100-D, GX 100-V, GX 140 through 142, GX 146, GX 148, GX 1013 through 1015]

**The Testimony of Aaron Zelin**

Testifying as an expert on militant jihadist groups [TT 434 *et seq.*], Aaron Zelin provided background on the Middle East and its politics, Islamic religion, and on ISIS and other jihadist groups. During his testimony, Zelin introduced two "propaganda" videos made by ISIS's media office and a spokesperson for ISIS, which had been retrieved from El Gammal's seized computer [GX 12 and 13] and these were shown to the jury. [TT 511-512.]

---

[3] This included private messages directly sent between El Gammal and Samy [GX 100-B], El Gammal and Aboualala [GX 120-A], and El Gammal and others [GX 100-G] (including links to other content), and also including evidence that some messages had been deleted [TT 125, 144-145]; content "shared" to El Gammal's public page by others, linked by El Gammal to the public pages of others, or otherwise found within his account data, including text, photographs, and videos [GX 100-D, GX 140-141, and GX 146, GX 148]; material posted publicly by El Gammal on his page, also including text, photographs, and videos [GX 100-N, GX 110-V]; and evidence contained in GX 103, in relation to deleted messages [see TT 170-173]

[4] This included private messages between Samy and El Gammal [GX 110-B, GX 111-A, GX 112-A], Aboualala [GX 110-F], and Samy's brother [GX 110-G, 111- C], cousin [GX 111-D], and father [GX 111-E, 112-D], also including evidence relating to deleted messages [TT 134-135, 144-145, 147-148]; and material posted publicly by Samy on his page, or otherwise found in his account data, including photographs, text, etc. [GX 111-F]

[5] This included messages, especially between Aboualala and El Gammal [GX 102- A, 120-A], and other material found in his Facebook account data.

**The Testimony of Timothy McNulty**

Timothy McNulty was an FBI agent who became involved in the investigation of this case

in 2016 (well after El Gammal's arrest). In particular, he testified about:

- Messages regarding El Gammal's arrest and the subsequent creation by Samy of a video in which he stated, inter alia, that El Gammal had nothing to do with Samy going to Syria ("the exoneration video"). This evidence included September, 2015, Facebook messages and related content in which Aboualala told Samy that El Gammal and his lawyer wanted Samy to make the video,[6] Samy's agreement to make it, and evidence that it was sent to Aboualala on September 8, 2015. [GX 113-A.] The video itself [GX 143] was retrieved by the agent, and played for the jury. [TT 945-962.]

- Various messages from 2014 between El Gammal and Aboualala [GX 122 excerpts lettered C-G and I] focusing on their political opinions, contemporaneous messages of similar import between El Gammal and Samy [GX 100-B], and other messages between Samy or El Gammal and third parties. [GX 110-D, GX 100-E] There were also messages [GX 100-S and 120-A] between El Gammal and Aboualala in connection with Samy's travel plans for Turkey.[7]


**The Testimony of Craig Roth**

Craig Roth testified in his capacity as an FBI forensic examiner specializing in information

technology. [TT 1202 *et seq.*] Although the thrust of his testimony was technical in nature, and

related to his examination of the electronic equipment seized from the post-arrest search of El

Gammal's residence [GX 1, 2, 3, 4], the government played two videos that Mr. Roth located on El

Gammal's computer [GX 11 and 15] and presented two groups of messages from other messaging

applications: GX 4-B (containing "WhatsApp" messages between Samy and El Gammal in July of

2015) and GX 4-C (containing, as pertinent, "Tango" messages between El Gammal and

Aboualala in May of 2015, at the time Samy's father was in Turkey looking for his son, a trip

discussed in further detail *infra*).

---

[6] There is no evidence that this was true.

[7] Included in this testimony were 15 notations of messages that had been deleted, and discussion of deleting messages.

**The Testimony of Mohammed El-Goarany**

Mohammed El-Goarany (Mohammed), Samy's father, testified pursuant to a non-prosecution agreement with the government. [TT 1051 *et seq.*] He related his discovery that Samy had left and his efforts to learn about his son's whereabouts. He found that Samy had traveled to Istanbul, and he was able to identify El Gammal and Aboualala, as well as another individual through whom Mohammed would eventually make contact with Aboualala. [TT 1054-1057.]

Mohammed testified that in May, 2015, he flew to Istanbul to attempt to find his son. He then met with Aboulala on two occasions. He learned that Samy had met with Aboualala in Istanbul "for a couple of hours." [TT 1055-1065][8] The following day, Samy called his father in Istanbul. [TT 1066.]

Mohammed also testified as to the following:

- In their first call, Samy told his father that he was in Syria, and that it would be dangerous for his father to attempt to come there. [TT 1066-1067.]

- While in Turkey, Mohammed continued to speak with Samy daily and Samy told him that he was in religious training with ISIS at the time, and would then undergo military training. Mohammed would continue to speak with Samy after he returned to the United States. [TT 1069, 1073.]

- Samy told his father that Aboualala "told him [Samy] where to go and he told me that he didn't go for the borderline Turkey to Syria using his passport, he had been smuggled." [TT 1107.]

- After El Gammal's arrest, Aboualala texted and called Mohammed several times and sent him a copy of the charges via Facebook. Aboualala asked him to help El Gammal by hiring a lawyer and also by lying to the FBI but Mohammed testified that he did not comply with this request. Samy also called Mohammed and said that Aboualala had asked that Samy call his father to ask for help for El Gammal, which Mohammed understood to be another request that he lie but again he did not. Aboualala then offered a "trade" promising to get Samy out of Syria if Mohammed got El Gammal out of jail. [TT 1107-1109]

---

[8] At the first meeting, over dinner, a video [GX 145] was made. In it Aboualala (who, like Mohammed, was Egyptian) can be seen making a hand gesture associated with the Muslim Brotherhood, and Mohammed then made a gesture indicating that he did not support that organization. [TT 1064.]

No evidence was introduced suggesting that Samy shared his plan to travel to Syria to join ISIS with his father, or with his mother, Maria Teresa El Goarany, who also testified. [TT 1025 *et seq.*] In fact, and as addressed more fully below, the government introduced evidence that only two people were aware of the true nature of Samy's plans prior to his departure, his younger brother, Tarek El-Goarany, and his cousin, Ahmed El-Goarany.[9]

**What Tarek El-Goarany Knew**

Tarek El-Goarany ("Tarek"), Samy's brother, testified pursuant to a non-prosecution agreement with the government. He is the only person who testified that he knew about Samy's plans to join ISIS in advance of Samy's travel to Turkey. As Tarek testified, by the summer of 2014, Samy was frequently speaking about ISIS, and explicitly told him that he wanted to join ISIS and fight for them.  [TT 736; 746-47.] Yet Tarek was more than just a confidante with whom Samy shared his plans.

Tarek provided key assistance to Samy in his efforts to travel to Turkey and get to Syria before their parents (or investigators) learned where he had gone. When Samy initially bought a Turkish Airways ticket from John F. Kennedy Airport to Turkey with cash, Tarek traveled with him to the airport by subway and AirTrain. [TT 207, 754.] Samy specifically told Tarek that he was not buying a one-way ticket because doing so would arouse suspicion. [TT 755.] Tarek witnessed Samy prepare for his trip and joined Samy as he purchased the gear he would need once he arrived, including combat boots and a camel bag. [TT 749, 758.]

When Samy went to destroy the computer that had evidence of his conversations about his travel plans – critical to the investigation – it was his brother Tarek who accompanied him. [TT 236, 735.] Indeed, Tarek was there in late September / early October 2014 to witness Samy

---

[9] Evidence was presented at trial that Samy's father, Mohamed El-Goarany, discovered Samy's plan to join ISIS in Syria after Samy left.

driving to a dumpster on a farm, removing the computer hard drive, smashing it on the ground and the dumpster floor before speeding away to a friend's house. [TT 753-754.]

The brothers would discuss Samy's plans to join ISIS, turning off their cell phones (at Samy's request) to avoid any possible government surveillance of their conversations. [TT at 750.] The two had a code word that they would use for ISIS. [*Id.*] Tarek was one of only two people with whom Samy communicated on the encrypted app PQChat, the other being their cousin Ahmed. [TT 275.] Tarek knew that Samy was lying to their mother when he claimed that he had hoped to travel to Turkey to help Syrian refugees. [TT 756.]

Upon his arrival in Turkey, Samy contacted Tarek, asking him to lie to their parents about his whereabouts. [TT 760.] In January and February 2015, Samy wrote to Tarek several times, and told him that he was traveling to join, and then had joined, ISIS in Syria. [TT 761-766.] As his training with ISIS continued and advanced, Samy shared detailed information about it with Tarek. [TT 785-787.] It was Tarek to whom Samy confided that he was going to be deployed into combat in late July or early August, 2015. [TT 789.]

As Agent Collie testified, Samy contacted Tarek using the telephones of at least three different ISIS members and was communicating with his brother Tarek during the course of the FBI investigation. [TT 295-297.] According to Agent Collie, after Samy left to join ISIS he and Tarek were "talking up a storm" on WhatsApp. [TT 334-335.] Tarek also received and accepted a social media request to connect from a known-ISIS member. [TT 296.] Aware that the FBI was investigating him, Samy warned Tarek that the government was likely also monitoring their communications. [TT 796.]

On February 6, 2015, weeks after Tarek knew that Samy had left for Turkey and Syria, Tarek and his parents sat down for a meeting with the FBI that lasted several hours. [TT 865-65, 67.] During that meeting, Tarek lied to the FBI, disavowing any knowledge of Samy's location or purpose in traveling. [TT 868.] Though the FBI asked Tarek and his family to contact them with

8

any new information, Tarek did not speak with the agents again until May 2015, despite the many communications he received from Samy. [TT 868.] Then, at Tarek's second meeting with the FBI in May 2015, initiated by the agents, he continued to lie – claiming that his father was in Egypt when, in fact, Mohammed El-Goarany had traveled to Turkey to follow Samy's trail. [TT 868–69.]

Tarek lied to the FBI agents – and was investigated for the critical assistance he provided in getting Samy to Syria. [TT 206-207.] He falsely told the agents that Samy was helping refugees. [TT 767.] He deleted messages with Samy before the agents had a chance to review them. [*Id*.] For months, he concealed from the FBI that Samy was with ISIS, only admitting it after he was confronted by the agents in the summer of 2015. [*Id*.] Tarek kept secrets for Samy, covered for him and destroyed evidence for him. [TT 823-824.].

**What Ahmed El-Goarany Knew**

Samy's cousin, Ahmed El-Goarany was not called as a witness at trial, but evidence was presented that Samy also confided in Ahmed about his plans. In fact, on the very day that Samy traveled to Turkey, he communicated with Ahmed. [TT 292.] At trial, Tarek testified that Samy told Ahmed "certain things" [TT 840] but it was not clear that Ahmed was privy to the same level of detail as Tarek. However, like Tarek, Ahmed knew that Samy had left the United States to join ISIS. [TT 850.] And Tarek and Ahmed made a pact to keep the true purpose of Samy's travel to Syria a secret from their family members. [TT 851.] Indeed, Tarek recommended to Ahmed that they keep the information to themselves and say a "big F--- YOU" to the rest of the family. [TT 857.]

**What Ahmed El Gammal Knew**

In contrast to evidence presented about Tarek and Ahmed, there was no evidence presented establishing that Mr. El Gammal knew that the real reason behind Samy's trip to Turkey was to get to Syria to join ISIS, and certainly no evidence establishing that Mr. El Gammal knew that Samy intended to get military training from ISIS. Critically, none of the private Facebook

messages exchanged between Mr. El Gammal and Samy, Mr. El Gammal and Aboulalala, and Samy and Aboulalala, introduced by the government at trial, demonstrate that Mr. El Gammal was among the small group of people with whom Samy shared his true purpose.[10] And while Tarek testified that Samy told him that Mr. El Gammal "helped in the vaguest and most general of terms," with Samy's plan to join ISIS, he did not testify that Mr. El Gammal was aware of Samy's true objectives. [TT 802.] Notably, when Tarek pressed Samy for details on the nature of the help provided, Tarek testified that "he did not tell me. He just said he helped him." [TT 803.]

In place of evidence of Mr. El Gammal's knowledge of Samy's purpose, the government presented evidence of Mr. El Gammal's support of ISIS on social media and in communication with Aboualala and others;[11] evidence of numerous and frequent encrypted communications between Mr. El Gammal and Samy;[12] the fact that both Samy and Mr. El Gammal had deleted many of their Facebook messaging exchanges;[13] and the fact that Mr. El Gammal sent Samy a link to a *Vice* News documentary about ISIS.[14]

**What Samy Told Others**

Outside of the inner circle of his brother Tarek and his cousin Ahmed, there were a number of people with whom Samy shared partial truths, about both his interest in ISIS, and his plans. For

---

[10] *See, e.g.,* private messages directly sent between El Gammal and Samy [GX 100-B; 110-B; 111-A, 112-A], El Gammal and Aboualala [GX 120-A], Aboualala and Samy, [GX 110-F];  Samy and his brother, Tarek, cousin and father [GX 110-G, 111-C, 111-D, 111-E, 112-D; and El Gammal and others [GX 100-G] (including links to other content), and also including evidence that some messages had been deleted [GX 103, T 125, 134-135, 144-145, 147-148, 170-173].

[11] *E.g.,* PSR ¶ ¶ 18-19; GX 100-E-T at 5; GX 100-D-T; GX 122-F-T at 3-4; GX 120-A-T at 24; GX 100-J-T at 6; GX 100-O-T at 2; GX 100-O-T at 3;  GX 100E-T at 46; and GX 100-E-T at 54.

[12] PSR ¶ 23; *see also* GX 1106 (trial stipulation indicating that Petitioner and El-Goarany exchanged at least 970 messages over Surespot.)

[13] PSR ¶ 22; GX 100-B at 13, 22, 26, 28, 29 (messages deleted by Petitioner); GX 110-B at 4-11, 16-18, 27 (messages deleted by El-Goarany); GX 1201 at 4).

[14] PSR ¶ 22; GX 1201 at 4; GX 140 (*Vice* News documentary, "The Islamic State Part 2 of 5".

example, Samy confided in his friend Rameez Farooqi that he would be traveling to Turkey, asking Farooqi to tell anyone who asked that Samy had started an internship. [TT 270.] His close friend Khalafalla Osman testified as to Samy's interest in ISIS, researching the group while also expressing disagreement with their violent methods. [TT 1482.] Samy talked about ISIS with Osman in person and online as early as July 2014, as the news media was heavily covering the fall of Mosul to the Islamic State. [TT 1494, 1482-1483.] By November 2014, Samy was telling Osman that he was "going to do humanitarian aid in Turkey" – though when telling Osman this plan, Samy required that their telephones be turned off. [TT 1485-1486.]  Samy confided in Osman that he would actually be going to Syria and that he did not intend to return to the United States. [TT at 1489.] He also acknowledged to Osman that his work would be illegal. [TT at 1490.] Concerned for his friend, Osman unsuccessfully tried to talk Samy out of traveling. [TT at 1491.] Samy then installed encrypted communication software on Osman's computer, so that they would be able to communicate with each other. [TT at 1492.] After arriving in Turkey and traveling to Syria, Samy continued to contact Osman periodically. [TT at 1505-1507.]

Moreover, there was substantial evidence about Samy's independent initiative to travel to Syria and join ISIS. Samy visited websites that provided information about ISIS and traveling to Syria. [TT  277-278.] Samy made a plan to travel to Istanbul and then go into Syria. [TT 747.] He made hotel reservations in Turkey in his own name, by himself. [TT 290.]  Before Mr. Gammal's involvement, Samy was following ISIS, having been successfully recruited by the group's online propaganda machine, and was determined to go to Syria to join the group.

Samy El-Goarany's travel to Turkey and into Syria to join ISIS, and his evasion of arrest, was a function of his own determination, aided by the active and passive help of his family members. While the trial evidence may have shown Mr. El Gammal helped play a role in Samy's arrival in Syria, he was surely not alone in doing so.

**Defense Counsel's Rule 29 Motion**

After the government rested its case, defense counsel made an oral motion pursuant to

Rule 29 for a judgment of acquittal on the grounds of insufficiency. [TT 1343.] The government

argued that it had established a prima facie case such that a reasonable jury could find guilt on

each count, and the Court denied the motion. [*Id*.]

After the defense rested its case, defense counsel renewed its oral Rule 29 motion. [TT

1754.] The Court denied the motion. [*Id*.]

**Mr. El Gammal's Decision Not to Testify**

Mr. El Gammal's counsel was first asked about the witnesses they intended to call as part

of the defense case on January 18, 2017. On that date, trial counsel stated they had reached out to

a number of witnesses but did not mention the possibility that Mr. El Gammal would testify. [TT

1079-1080.] On January 20, 2017, the government rested its case. [TT 1342.] In a colloquy

concerning defense witnesses, the Court raised the possibility of doing an allocution with Mr. El

Gammal concerning his decision whether not to testify as follows:

> THE COURT: …Also, on the issue of Mr. El-Gammal's testimony
> or not, I do want the parties to begin thinking about whether you
> want me to do some sort of allocution with him as to whether he
> wants to testify or if he is not going to testify and, if so, what
> questions you believe I should be asking him.

Defense counsel thanked the Court for this offer but did not request such an allocution.

[TT 1363.]

On January 23, 2017, the Court asked again if Mr. El Gammal would be testifying:

> THE COURT: Let me ask this. Have you made a decision as to
> whether or not Mr. El Gammal will be testifying?
>
> MS. SHROFF: We have told the government, your Honor, I told
> them over the weekend so that they would not work on this
> unnecessarily, it is my understanding that he's not going to testify.
> I did tell them Saturday. I reiterated on Sunday and I believe I
> reiterated it to Mr. Quigley this afternoon.

THE COURT: Just --

MS. SHROFF: I'm assuaging their concern. And that still holds
true. You're welcome to conduct an inquiry if you want.

THE COURT: That's up to the parties if you want me to do that.
So then I'll send them home and we'll talk about whether we stick
around.

[TT 1534-1535.]

There was no further discussion on the record that day on the subject.

On January 24, 2017, the defense rested its case. [TT 1705.]

On January 25, 2017, the government and defense presented their summations to the jury.

On January 26, 2017, before the government's rebuttal summation, trial counsel told the

Court, in a sealed portion of the transcript, that ███████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ Then, in open court, defense counsel put it on the record

that Mr. El Gammal had asked his attorneys for the opportunity to speak to the Court. [TT 1926.]

After the government's rebuttal, defense counsel reiterated this request. [TT 1948.]

Thereafter, in a sealed portion of the record, Mr. El Gammal addressed the Court as

follows:





The Court responded:

Defense counsel asked for a moment to consult with Mr. El Gammal, and then the Court returned

to the public record to proceed with the jury charge. [TT 1950-1951.]

b. **Conscious Avoidance**

The Court's charge to the jury included the following instruction with respect to conscious

avoidance:

> In determining whether the defendant acted knowingly,
> you may consider whether the defendant deliberately closed his
> eyes to what would otherwise have been obvious to him. If you
> find beyond a reasonable doubt that, during the relevant time



period, the defendant acted with a conscious purpose of
avoiding -- to avoid learning the truth that Samy El- Goarany
intended to join ISIS, then this element may be satisfied.
However, guilty knowledge may not be established by
demonstrating that the defendant was merely careless,
negligent, or reckless.

If you find, during the relevant time period, the
defendant was aware of a high probability that Samy El- Goarany
intended to join ISIS and that the defendant acted with
deliberate disregard of that high probability, you may find that the
defendant acted knowingly.

[TT 1963-1964.]

In its summation, the government also told the jury that conscience avoidance was not a

defense to the charges. ("The defendant cannot run from his statements, his actions, his

instructions, his advice, to Samy El-Goarany. He cannot hide behind a veil of ignorance and then

pin blame on others for what he knew and what he did. Even if he didn't know every detail of the

plan for El-Goarany to join ISIS, it's only because he deliberately put his head in the sand. And as I

expect Judge Ramos will instruct you, willfully blinding yourself, consciously avoiding the facts, is

illegal. It's the same as knowing the facts.") [TT 1826-1827.]

### c. The Court's Instructions on Counts Three and Four

As this Court instructed the jury, in order to find Mr. El Gammal guilty of Count Three, the

jury was required to find beyond a reasonable doubt that a person knowingly received military-type

training from a designated terrorist organization, that certain jurisdictional requirements were

satisfied, and that Mr. El Gammal aided and abetted the person's receipt of that training. [TT 1982-

1983.]

In order to find Mr. El Gammal guilty of aiding and abetting, the Court told the jury that it

needed to find that he intended to aid in the crime's commission and "engaged in some affirmative

conduct or overt act for the specific purpose of bringing about that crime." [TT 1968-1969.] With

respect to the intent requirement, the Court explained, "the intent must go to the specific crime

15

charged. A person who actively participates in a criminal scheme with full knowledge of its extent and character intends that scheme's commission." [TT 1968.]

In order to find Mr. El Gammal guilty of the Count Four conspiracy offense, the jury needed to find beyond a reasonable doubt that an unlawful agreement existed between Mr. El Gammal and at least one other person to violate the law; that Mr. El Gammal knowingly and willfully joined the conspiracy to violate the law; that an overt act occurred; and that certain jurisdictional requirements were satisfied. [TT 1989.]

### d. The Jury's Deliberation/Mr. El Gammal's Conviction

The jury began deliberations following the charge on January 26, 2017, a Thursday. [TT 2021.] Deliberations continued on Friday, January 27, 2017 [TT 2034-2035] and ended on Monday, January 30, 2017, when the jury noted that through "difficult deliberation," it had come to a verdict. [TT 2038.] Mr. El Gammal was convicted on all counts. [*Id.*]

### e. The Appointment of New Counsel for Mr. El Gammal

On February 10, 2017, new counsel was appointed to represent the Petitioner after Mr. El Gammal wrote a letter to the Court requesting a change in counsel. [*See* Transcript from February 10, 2017.]

The Court relieved Federal Defenders and indicated that it was appointing Donald Doboulay[16] CJA counsel, to represent the Petitioner. [*Id.* at p. 8.] However, since Mr. Doboulay did not have security clearance, the Court contemplated appointing a second attorney with such clearance to assist Mr. Doboulay.

On February 14, 2017, the docket indicates that Donald Doboulay and Megan Wolfe Benett were appointed to represent the Petitioner.

---

[16] The transcript from this appearance incorrectly lists Mr. Duboulay's name as David Doubelay.

Counsel requested – and was granted – no less than five adjournments of the schedule for pretrial motions before deciding not to file any such motions. [*See* Docket #s 171, 174, 204, 206, 208, and 210.]

### f.  The Terrorism Sentencing Enhancements

In a sentencing submission prepared on behalf of the Petitioner, defense counsel objected to the application of U.S.S.G § 3A1.4, which provides enhanced offense level computation for "a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G § 3A1.4 Citing *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2008) and *United States v. Awan*, 607 F.3d 30 (2d Cir. 2010), counsel argued that the imposition of this enhancement required the Court to find that the Petitioner committed the felony with the specific intent "to commit an offense that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). [*See* Docket # 226, Defense Sentencing Submission, at pp. 5-7.]

Defense counsel further objected to the application of two-level increase on the basis of an offense involving "funds or other material support or resources" as provided for in U.S.S.G. § 2M5.3(b)(1), arguing that there was no proof that Mr. El Gammal had a "reason to believe" that El-Goarany would engage in violence as an ISIS fighter. [*Id*. at pp. 7-8.]

Defense counsel then recalculated the offense level without these enhancements to be 26. With a criminal history category of I, this resulted in an advisory guidelines range of 63-78 months. [*Id*. at p. 8.]

In opposing defense counsel's objections to the U.S.S.G § 3A1.4 enhancement, the government argued that the fact of Petitioner's conviction on two counts of material support to ISIS and two counts of aiding, abetting and conspiring in the receipt of military training through ISIS, together with Mr. El Goarany's actions, were sufficient to meet the calculation requirement, given

the overall mission of ISIS, ignoring clear Second Circuit precedent that U.S.S.G § 3A1 requires a finding that the Petitioner's offense was "calculated, i.e., planned—for whatever reason or motive—to achieve the stated object." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010). [*See* Docket # 217, Government Sentencing Submission, at pp. 16-19.]

In opposing defense counsel's objection to the imposition of the U.S.S.G. § 2M5.3(b)(1) enhancement, the government argued, without support from the record, that Mr. El Gammal's actions "necessarily" involved a "reason to believe" that El Goarany would engage in violent acts. [*Id.* at pp. 20-21.]

### g. The Appropriate Sentence on Count Three

In their sentencing submissions, the parties also addressed the appropriate sentence for Mr. El Gammal's conviction for aiding and abetting the receipt of military-type training from a foreign terrorist organization, in violation of 18 U.S.C. § 2339D and 2 (Count Three).[17]

Defense counsel argued that because 18 U.S.C. § 2339D states that an offender "shall be fined under this title or imprisoned for ten years, or both," that under the plain language of that statute and binding Second Circuit caselaw, the sentence for Counts Three could be either a fine or a ten-year term of imprisonment. *See United States v. Pabon-Cruz*, 391 F.3d 86 (2d Cir. 2004).

The government agreed with defense counsel but argued that in light of the seriousness of Mr. El Gammal's crime, the Court should impose a 10-year sentence.

### h. Probation's Calculation of the Guidelines and Sentencing Recommendation

Probation calculated the advisory Guidelines as follows:

**Base Offense Level** (U.S.S.G. §2M5.3)                    **26**

**Specific Offense Characteristic**

---

[17] Defense counsel erroneously argued that the same potential penalties applied Count Four, under which Mr. El Gammal was convicted of conspiring to have another person receive military-type training from a foreign terrorist organization, in violation of 18 U.S.C. §§ 371 and 2339D. However, because this was a conviction under 18 U.S.C. § 371, the possible penalties under Count Four were a term of imprisonment of not more than five years, a fine, or both. 18 U.S.C. § 371.

| | |
|---|---|
| (U.S.S.G. §2M5.3(b)(1) | **+2** |
| **Victim Related Adjustment** | **+12** |
| (U.S.S.G. §3A1.4(a)) | |
| **Total Offense Level** | **40** |

[PSR ¶¶ 46-56.]

With zero criminal history points, Probation determined that Mr. El Gammal was in Criminal History Category I.[18] [PSR ¶¶ 58-62.] With a Criminal History Category of I and an offense level of 40, Probation determined that the advisory Guidelines range was 292 to 365 months. [PSR ¶ 105.]

i. **The Sentencing**

On December 18, 2018, Mr. El Gammal appeared before this Court for sentencing.

This Court rejected defense counsel's arguments concerning U.S.S.G §§ 3A1.4 and 2M5.3(b)(1).

With respect to U.S.S.G. § 2M5.3(b)(1), the Court found that it "could be easily established by a preponderance of the evidence…that Mr. El Gammal engaged in this activity with Mr. El-Goarany knowing that Mr. El-Goarany was very incentivized to travel to Syria in order to fight, to become a fighter with ISIL, an organization that has been deemed to be a foreign terrorist organization, an organization that had declared war against the United States and others and that Mr. El Gammal knew that Mr. El-Goarany was going to willingly engage in acts of violence." [Sentencing Transcript, pp. 11-12.] With respect to U.S.S.G. § 3A1.4, the Court found that the facts at trial showed that "Mr. El Gammal was very motivated. He was very interested in what was going on in Egypt and could be upset about the situation in Egypt and very desirous to do something."

---

[18] While U.S.S.G. §3A1.4(b) also raises a defendant's Criminal History Category in all cases to Category VI, Probation did not make this adjustment, and the government did not request it.

[Sentencing Transcript, pp. 16.] The Court further noted that "Mr. Samy El-Goarany also indicated that he was motivated in large part by the events at Rabaa Square and therefore, joined [ISIS] in order to help because at least if in large part because of that." [*Id.*] The Court found the enhancement applied as the evidence presented at trial "evinces an intent to promote the crime of terrorism." [*Id.*]

The Court calculated the guidelines, finding a total offense level of 40, a criminal history category of I, and an advisory Guidelines range of 292 to 365 months [*Id.*]

The Court then permitted the parties to make arguments with respect to the appropriate sentence. As part of its argument, the government argued that the Court should impose a 10-year term of imprisonment on Count Three. [Sentencing Transcript, p. 21.] The Court responded:

> That's a curious statute. I've not had occasion to apply it before. So
> I can fine him a hundred dollars on this count or sentence him to a
> term of imprisonment but if it's imprisonment it has to be ten
> years?

[*Id.*] The government confirmed that this was, in fact, the case, and explained that it was asking for a carceral sentence on this count "because it would be appropriately punish Mr. El Gammal for aiding and abetting al Goarany's receipt of military-type training from ISIS." (*Id.*)

Defense counsel argued that without the imposition of the sentencing enhancements, that Mr. El Gammal would be facing a guideline range of 63 to 78 months, and asked the Court "if the offense conduct that factored into those enhancements was sufficiently severe" such that the Court believed it was necessary for the minimum sentence to be increased from 63 to 292 months." [Sentencing Transcript, pp. 23-24.]

The Court questioned whether 63 was the appropriate anchor, considering that if it imposed a carceral sentence on Count 3, the minimum sentence would be 120 months. [Sentencing Transcript, p. 24.] Defense counsel responded that the Court should not be driven by the minimum

term of imprisonment on Count 3, because Congress has indicated that a fine is an appropriate and adequate punishment. [*Id*.]

After hearing from the parties, your Honor sentenced El Gammal to a below-guidelines sentence of 144 months' imprisonment on Counts One and Two, 120 months' imprisonment on Count Three, and 60 months' imprisonment on Count Four of the Indictment, all to run concurrently. [Sentencing Transcript, pp. 46-53.]

### j.  The Appeal

A notice of appeal was filed on Mr. El Gammal's behalf on January 22, 2019.

Mr. El Gammal's appellate counsel raised two issues on appeal: (1) whether the District Court abused its discretion in making certain evidentiary rulings, depriving Mr. El Gammal of his right to a fair trial; and (2) whether the District Court erred in charging the jury on conscious avoidance.

On October 26, 2020, issued a summary order, affirming this Court's judgment.

Mr. El Gammal filed a motion for rehearing/rehearing en banc which was denied, and on December 11, 2020, the judgement mandate issued.

## <u>SUMMARY OF ARGUMENT</u>

Mr. El Gammal's appellate counsel was ineffective for failing to challenge his conviction on Count Three, for aiding and abetting Samy El-Goarany's receipt of military training from a foreign terrorist organization, and on Count Four, for conspiring to have Samy El_Goarany receive military-type training from a foreign terrorist organization, in violation of 18 U.S.C. §§ 2339D, 2, and 371.

To find Mr. El Gammal guilty on Count Three, the jury needed to find, not just that Samy El-Goarany knowingly received military-type training, but that Mr. El Gammal intended for Mr. El-Goarany to receive the training, that he had full knowledge of the extent and character of the

criminal scheme, and that he engaged in affirmative conduct with the specific purpose of bringing it about.  At trial, the evidence was insufficient to establish that Mr. El Gammal had the requisite knowledge or intent.

To find Mr. El Gammay guilty on Count Four, the jury needed to find that an unlawful agreement existed between Mr. El Gammal and Mr. El-Goarany for Mr. El-Goarany to receive military training from a foreign terrorist organization, and that Mr. El Gammal knowingly and willfully entered into this agreement. Here, too, the government has offered no evidence to establish an agreement between Mr. El Gammal and Mr. El-Goarany that the latter would undergo military training with ISIS in Syria.

Mr. El Gammal's appellate counsel was further ineffective for failing to raise arguments concerning the erroneous application of certain sentencing enhancements.  First, the 12-point enhancement under U.S.S.G. § 3A4.1 only applies where a defendant's offense is calculated (i.e., intended) to influence, affect, or retaliate against government conduct. Here, the government failed to prove that Mr. El Gammal sought to influence or affect the conduct of the government, rendering the enhancement inapplicable.

Second, the 2-point enhancement under U.S.S.G. § 2M5.3 (b)(1) only applies where the evidence establishes that the support provided by the defendant was specifically intended to support violence. Here, because the government failed to prove that Mr. El Gammal was aware that Samy El-Goarany intended to engage in violent acts by going to Syria, this enhancement was applied in error.

<u>**ARGUMENT**</u>

**I.     MR. EL GAMMAL'S APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE MR. EL GAMMAL'S CONVICTIONS ON COUNTS THREE AND FOUR ON THE GROUNDS OF INSUFFICIENCY**

**A. Governing Law**

Section 2255 of title 28 of the United States Code permits a federal prisoner to move to vacate, set aside, or correct his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a) (2016). Therefore, relief is available "under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000) (*quoting United States v. Bokun*, 73 F.3d 8, 12 (2d Cir.1995)). The petitioner bears the burden of proving that he is entitled to relief by a preponderance of the evidence. *See Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011).

Here, the constitutional error at issue under both Points I and II relates to Mr. Ahmed's Sixth Amendment right to the effective assistance of counsel.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his counsel's performance "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). In examining such a claim, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. If the defendant fails to satisfy either prong, the court does not need to consider the other. *Id*. at 697.

23

In considering ineffective assistance of counsel claims under *Strickland*, the Second Circuit has held that a defendant "need establish only that he has a 'plausible' claim of ineffective assistance of counsel, not that 'he will necessarily succeed on the claim.'" *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (*quoting Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000)).

In considering the performance prong, a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Petitioners are tasked with overcoming "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (*quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Under the prejudice prong, courts consider "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. Where, as here, a petitioner challenges his sentence, "the petitioner must show that but for counsel's ineffectiveness, there is a reasonable probability that the sentence imposed would have been different." *Martin v. United States*, 834 F.Supp.2d 115, 126 (E.D.N.Y. 2011) (*citing United States v. Workman*, 110 F.3d 915, 920 (2d Cir.1997)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A petitioner can prevail in a claim that counsel was ineffective for failure to raise an argument where he can demonstrate that counsel omitted a significant and obvious issue, while pursuing issues on appeal that were "clearly and significantly weaker." *See Mayo v. Henderson*, 13 F.3d 528 at 533 (2d. Cir. 1994).

With respect to Mr. El Gammal's claims under Point I, that appellate counsel was ineffective for failing to raise the insufficiency of the evidence supporting Counts 3 and 4, the underlying sufficiency claims were properly preserved – and available for appellate counsel to raise on appeal -  because they were raised by defense counsel in oral motions for a directed verdict of

acquittal under Rule 29 of the Federal Rules of Criminal Procedure made at the close of the government's case, and again, at the close of all of the evidence. *See, e.g., United States v. Allen*, 127 F.3d 260, 264 (2d Cir. 1997) ("To preserve the sufficiency issue and avoid the burden of showing plain error, a defendant must have moved for judgment of acquittal either at the close of all the evidence pursuant to Rule 29(a) or post-trial in a motion pursuant to Rule 29(c).") [19]

Rule 29 of the Federal Rules of Criminal Procedure authorizes trial courts to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. "A defendant challenging the sufficiency of the evidence bears a heavy burden because a reviewing court must consider the evidence in the light most favorable to the prosecution and uphold the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Bramer*, 956 F.3d 91, 96 (2d Cir. 2020); *see also United States v. Alcius*, 952 F.3d 83, 86 (2d Cir. 2020), *cert. denied*, —— U.S. ——, 141 S. Ct. 296, —— L.Ed.2d —— (2020) ("A defendant bears a heavy burden because we view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility.... We will sustain the jury's verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") In other words, "a court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006); *accord United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013).

---

[19] Given that trial counsel's oral motions preserved this issue for appeal, the failure of sentencing counsel to make this motion in a written submission, despite requesting – and receiving – no less than five adjournments to write the motion, does not rise to the level of ineffective assistance of counsel. That trial said, counsel's failure to marshal the facts in a written submission to this Court, which after presiding over the trial, was best positioned to rule on it, was a strategic mistake, which was later compounded by appellate counsel's failure to raise the issue at all.

**B. The Evidence Was Insufficient to Convict Mr. El Gammal on Count Three, for Aiding and Abetting the Receipt of Military-Type Training from a Foreign Terrorist Organization**

Pursuant to this Court's jury instructions, in order to find Mr. El Gammal guilty on Count Three, the jury needed to find, not just that Samy El-Goarany knowingly received military-type training, but that Mr. El Gammal intended for Mr. El-Goarany to receive the training, that he had full knowledge of the extent and character of the criminal scheme, and that he engaged in affirmative conduct with the specific purpose of bringing it about.

In *United States v. Kabir*, the evidence was not sufficient to establish guilt under § 2339D because the defendant had expressed support for not just Al-Qaeda, a designated terrorist organization, but also the Taliban, which was not on the State Department's list. *United States v. Kabir*, 828 F. App'x 396, 398-399 (9th Cir. 2020).  Further, the defendant's *willingness* to join a terrorist organization that had been designated by the State was not sufficient evidence for the count. *Id.* at 399.

Here, too, Mr. El Gammal expressed support for a number of causes and entities but there was no question that his primary concern was Egypt. In numerous instances, he expressed support for the Muslim Brotherhood, which has not been designated a terrorist organization. And in fact, Mr. Aboulalala, who the government claimed facilitated Mr. El-Goarany's entry into Syria, was committed to the Muslim Brotherhood. Mr. El Gammal was well within his First Amendment right to make the statements supporting ISIS that largely constitute the government's proof in this case.

The government presented no evidence at trial that established that Mr. El Gammal had the requisite knowledge or intent. Indeed, El-Goarany's family had much more knowledge of his plans to undergo such training. The only people with whom Mr. El-Goarany discussed military training were Tarek [TT 785-787] and his father [TT 1069, 1073]. Tarek was with him when he purchased combat boots and a camel bag. [TT 749, 758.]

26

The shred of evidence put forth by the government is that Mr. El Gammal forwarded a video about ISIS to Mr. El-Goarany. But this video was not even created by ISIS, but rather it was popular journalistic reporting of the training that ISIS provided in a documentary by Vice News, a mainstream media outlet. [GX 140.] This reporting was hardly ISIS propaganda; the video series won a Peabody Award.[20] Moreover, this "evidence" hardly proves "aiding and abetting", given how much independent research Mr. El-Goarany did into ISIS on his own, including the online contact he forged on his own with the group's online propaganda machine. Similarly, the government's evidence refutes the notion that Mr. El Gammal was in any position to assist Mr. El-Goarany join ISIS or that he had any ties to ISIS. The government contended at trial that Mr. El Gammal sought more information from Mr. El-Goarany about joining ISIS, when he sent a Facebook message, "Is it easy to park a car into ur job parking lot." [PSR ¶14, GX 112-A.]

No rational trier of fact could find beyond a reasonable doubt that the elements of this offense were met with this evidence.

**C. The Evidence Was Insufficient to Convict Mr. El Gammal on Count Four, for Conspiring to Have Another Person Receive Military-Type Training from a Foreign Terrorist Organization**

Pursuant to this Court's jury instructions, in order to find Mr. El Gammal guilty of 18 U.S.C. § 2339D for the purposes of Count Four, the jury needed to find beyond a reasonable doubt, among other things, that an unlawful agreement existed between Mr. El Gammal and Mr. El-Goarany for Mr. El-Goarany to receive military training from a foreign terrorist organization, and that Mr. El Gammal knowingly and willfully entered into this agreement.

In *United States v. Kabir*, the Ninth Circuit held that the government's evidence was not sufficient to establish guilt under § 2339D where the government could not prove a "meeting of the

---

[20] https://peabodyawards.com/award-profile/the-islamic-state/

minds" for the purposes of a conspiracy to provide military training to a terrorist organization. 828
F. App'x 396 at 399.

Here, too, the government has offered no evidence that proves this "meeting of minds" by
Mr. El Gammal and Mr. El-Goarany that the latter would undergo military training with ISIS in
Syria. As discussed above, the government's evidence boils down to the *Vice* documentary that Mr.
El Gammal forwarded to Mr. El-Goarany and the fact that Mr. El-Goarany received military
training in Syria. But this is hardly sufficient proof of an agreement.

Thus, no rational trier of fact could find beyond a reasonable doubt that the elements of this
offense were met.

### D. Mr. El Gammal's Appellate Counsel's Failure to Make an Insufficiency Argument on Appeal with Respect to Counts Three and Four Constituted Ineffective Assistance of Counsel

Because no rational trier of fact could have found the essential elements of Counts Three
and Four beyond a reasonable doubt, Appellate counsel's failure to advance these claims on appeal
cannot be considered sound strategy. The arguments were preserved at the district court level.
Notably, appellate counsel acknowledges in his affidavit that Mr. El Gammal asked him to raise
these issues on appeal. [*See* Affidavit from Jeremy Gutman, Esq., attached as Exhibit A.] Making
them would not have detracted from the other arguments counsel sought to raise, which were
arguably weaker because they related to evidentiary issues. A reasonable probability exists that had
appellate counsel raised these arguments on appeal, Counts Three and Four would have been
dismissed.[21]

---

[21] The failure of sentencing counsel to make this motion in a written submission - after this Court
granted no less than five adjournments to allow sufficient time for counsel to draft the motion -
deprived this Court of the opportunity to rule on the motion after a fulsome review of the evidence.
Given that sentencing counsel's failure to make this motion does not rise to the level of ineffective
assistance of counsel, given that trial counsel's oral motions preserved this issue for appeal, we
have not raised it as a separate claim.

With the dismissal of these counts, there is also a reasonable probability that Petitioner would have received a lower sentence. This Court sentenced the Petitioner to 144 months' imprisonment on Counts One and Two, 120 months' imprisonment on Count Three, and 60 months' imprisonment on Count Four, all run concurrently. While the Court had a choice of imposing a fine or a 10-year sentence on Count Three, if it determined that a term of imprisonment was appropriate, it could not impose anything other than a 10-year mandatory term. Had the Court not been so limited, a reasonable probability exists that the Court would have been swayed by defense counsel's request that the Court anchor its sentence in the much lower guideline range of 63-78 months, and that the sentence the Court ultimately imposed would have been significantly lower.

II.     **MR. EL GAMMAL'S APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE PROCEDURAL ERROR THAT RESULTED FROM THE APPLICATION OF SENTENCING ENHANCEMENTS U.S.S.G. §§ 3A4.1 and 2M5.3 (b)(1)**

### A. Governing Law

District courts are to use the Guidelines as a "starting point and initial benchmark," *Gall v. U.S.,* 552 U.S. 38 at 39 (2007), and then make an independent sentencing determination, taking into account the "nature and circumstances of the offense and the history and characteristics of the defendant," and all the statutory factors. *U.S. v. Cavera*, 550 F.3d 180 at 188 (2d Cir. 2008) (*quoting* 18 U.S.C. § 3553(a)). Sentencing courts are not to "presume that the Guidelines range is reasonable," and instead they "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

A sentence is procedurally unreasonable if the district court "fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *United States v. Chu*, 714 F.3d 742, 746 (2d Cir. 2013) (internal quotation marks omitted).

Where a petitioner procedurally defaulted his claims by failing to raise them either at trial and on direct appeal, a court will only review the claims if the petitioner demonstrates cause for the default of the claim, and prejudice that resulted from the alleged violation. *See Reed v. Farley*, 512 U.S. 339, 354 (1994) ("Where the petitioner ... failed properly to raise his claim on direct review, the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged ... violation.' ") (*quoting Wainwright v. Sykes*, 433 U.S. 72, 84 (1977)). A petitioner may overcome a procedural default, however, by demonstrating that his counsel's performance was constitutionally ineffective. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Here, Mr. El Gammal's counsel raised challenges to the sentencing enhancements under U.S.S.G. §§ 3A4.1 and 2M5.3 (b)(1) in Petitioner's sentencing submission and at sentencing, so these issues were preserved at the trial level. As the declaration from Mr. El Gammal's appellate counsel acknowledges, Mr. El Gammal requested that these arguments be raised on appeal, and appellate counsel elected not to do so. As addressed in further detail below, these claims were sufficiently strong that this Court can find that if counsel had raised them on appeal, there is a reasonably probability that the Circuit would have remanded the case to the district court, and that Mr. El Gammal's sentence would have been different. Furthermore, these claims were stronger than the discretionary evidentiary arguments that counsel raised on appeal because they pertained to the question of whether these sentencing enhancements were even applicable to the issues in this case.

**B. The U.S.S.G. § 3A4.1 Enhancement Does Not Apply Where the Underlying Conduct Is Not Aimed at Any Particular Government**

Section 3A1.4 of the Guidelines states:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

This terrorism enhancement results in a sharp sentencing increase for a felony that "involved or was intended to promote, a federal crime of terrorism." As a result of the application of § 3A1.4, a defendant's offense level is increased to a minimum of 32 and the criminal history category is designated Category VI regardless of if whether the defendant has previously committed a crime.

The term "federal crime of terrorism" means "an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government

conduct; and (B) is a violation of [various enumerated federal statutes]" 18 U.S.C. § 2332b(g)(5). The Second Circuit has interpreted § 2332b(g)(5)'s reference to "calculation" as imposing a specific intent requirement. *United States v. Siddiqui*, 699 F.3d 690, 709 (2d Cir. 2012), as amended (Nov. 15, 2012) ("'[I]f a defendant's purpose in committing an offense is ... to retaliate against government conduct,' application of the terrorism enhancement is warranted."); *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009) ("[C]omission of a federal crime of terrorism ... incorporates a specific intent requirement.").

In contrast, the material support statute only requires proof that a defendant attempted to, conspired to, or did provide "material support or resources to a foreign terrorist organization," with the knowledge "that the organization is a designated terrorist organization" or "that the organization has engaged or engages in terrorism." 18 U.S.C. § 2339B(a)(1). Thus, it is possible for a defendant to provide material support to a terrorist group in violation of 18 U.S.C. §2339B(a)(1) without meeting the specific intent requirement of the first prong of the definition of federal crime of terrorism for the enhancement to apply. That is, the enhancement only applies where the defendant's support or resources would influence, affect, or retaliate against government conduct. *See, e.g. United States v. Banol-Ramos*, 516 F. App'x 43, 47 (2d Cir. 2013) ("[A] conviction for material support of a terrorist organization does not necessarily imply that the defendant committed an offense of terrorism or that she provided firearms to that organization. Not all material support for terrorism is calculated to affect government conduct, nor does it always involve weapons."); *United States v. Siddiqui*, 699 F.3d at 709. ("Where, however, 'there is no evidence that the defendant sought to influence or affect the conduct of the government,' the enhancement is inapplicable.")

In *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010), the Second Circuit has explained that the word "calculation is concerned with the object the actor seeks to achieve through planning and contrivance," rather than with the actor's particular motive. *Id*. at 317. The proper focus of the

"calculation element" of § 2332b(g)(5)(A) is not "on the defendant but on his 'offense,' asking whether it was 'calculated,' i.e., planned—for whatever reason or motive—to achieve the stated object." *Id*. Thus, "a person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation." *Id.*

In order for the enhancement to apply, the Second Circuit indicated that "if the evidence showed that [defendant] engaged in criminal conduct with knowledge that confederates solicited his actions to effectuate politically motivated bombings in India, or homicidal attacks on the country's security forces or its political leaders, such proof could demonstrate that [defendant's] crimes were calculated to influence the conduct of government even if he was not personally motivated by that object." *Id*. at 317-18. The Second Circuit remanded for the district court to reconsider whether the evidence supported the terrorism enhancement. *Id.* at 318.

"To be sure, whether a defendant's offense is calculated (i.e., intended) to influence, affect, or retaliate against government conduct is a highly fact specific inquiry that requires examining the record as a whole." *United States v. Arcila Ramirez*, 16 F.4th 844, 854 (11th Cir. 2021) However, because a defendant often will not admit his full knowledge or intentions, the district court may find the requisite calculation or intent existed based on circumstantial evidence and reasonable inferences drawn from the facts.

In *United States v. Alhaggagi*, the Ninth Circuit overturned a district court's application of § 3A4.1 where a defendant opened six social media accounts for individuals whom he believed sympathized with ISIS based on evidence that he knew he was providing support to ISIS sympathizers and the fact that he knew that ISIS was a terrorist organization. 978 F.3d 693 (9th Cir. 2020). The circuit court found that that the enhancement was not proper because this evidence did not establish specific intent for the purposes of the § 3A4.1 enhancement even if it was sufficient to establish "knowledge" for material support under § 2339(B)(a)(1). The Ninth Circuit stated that the district conclusion that the enhancement applied "rest[ed] on the erroneous assumption that in

33

opening the social media accounts for ISIS, Alhaggagi necessarily understood the purpose of the accounts was 'to bolster support for ISIS's terrorist attacks on government and to recruit adherents.'" Citing specific acts of terrorism where the enhancement was triggered because the intent element would be clearly established, such as "to bomb a federal facility, planning to blow up electrical sites, attempting to bomb a bridge, or firebombing a courthouse," the Ninth Circuit found Alhaggagi's conduct distinguishable because opening a social media account does not "inherently or unequivocally constitute conduct motivated to 'affect or influence' a 'government by intimidation or coercion.'" *Id.* at 702. As the court observed, the opening of social media accounts and influencing government conduct by intimidation and coercion are "too attenuated" for the enhancement to apply. *Id.* at 702-03. Instead, "the district court had to determine that Alhaggagi knew the accounts were to be used to intimidate or coerce government conduct." *Id.* (citing *Awan*, 607 F.3d at 317-18).

In Mr. El Gammal's case, in order to apply an enhancement under § 3A4.1, this Court would have needed to find specific intent, that Mr. El Gammal's offense "involved" or "was intended to promote" a federal crime of terrorism.

In finding that § 3A4.1 applied, the only relevant evidence that this Court could find in the record was that "Mr. El Gammal was upset about the situation in Egypt and very desirous to do something," and that Samy El-Goarany was "motivated in large part by the events at Rabaa Square." [Sentencing Transcript, p. 16.] The mere fact that Mr. El Gammal and Mr. El-Goarany may have expressed concerns for the political situation in Egypt does not meet the calculation requirement for § 3A4.1.

The government's argument that this enhancement applies largely seems to rest on one statement by Mr. El-Goarany that he made after arriving in Syria. He wrote, "Over two years since Egypt's military coup, approaching the second anniversary of the Rabaa massacre. In case you're wondering why I'm here today." While Mr. El-Goarany may have expressed that he had joined

ISIS in response to the coup in Egypt, there is no evidence that Mr. El Gammal knew that Mr. El-Goarany had any such aims prior to arriving there or intended to "influence or affect the conduct of government by intimidation or coercion."  Furthermore, this statement does not impute any intent to Mr. El Gammal.

In attempting to link Mr. El Gammal and his support for ISIS's involvement in Egypt, the government largely relied on one statement he made. He wrote of ISIS, "May God grant them victory and take over Jordan, and then Saudi Arabia, then conquer Egypt after that." [TT. 14-15] This statement followed another in which Mr. El Gammal hoped for ISIS's expansion in the region. Mr. El Gammal's general statements of support for the toppling of various dictatorships and monarchies in the region does not merit the application of an enhancement because it does not specifically target any particular government and certainly not Egypt. Rather, Mr. El Gammal's statements actually reveal that Mr. El Gammal believed that any influence could conceivably have in the region was so far in the remote distance that it was hypothetical and the stuff of jokes. In the same conversation thread, Mr. El Gammal stated, "If Daesh gets to Egypt I will join them…so I can torture them…and whip the Egyptians…hehehehehehe…hehehehe" [GX-100-OT, p. 3-5.]

Furthermore, these generalized statements also do not connect any assistance that Mr. El Gammal provided Mr. El-Goarany with travel to the region with the specific intent that Mr. El-Goarany wage warfare against all these nation states. Unlike offenses where "intimidation" or "coercion" of a government are an inherent part of the offense, Mr. El Gammal's conduct, putting Mr. El-Goarany in contact with a journalist in Turkey, is too "attenuated" for the enhancement to apply. The government's argument that Mr. El Gammal specifically intended for Mr. El-Goarany to pick up arms and fight against a government when he put him in contact with Attia Aboulalala is a stretch.

At the sentencing, the government urged this Court to apply the theory of "conscious avoidance" to suggest that Mr. El Gammal was "putting his head in the sand" in terms of his

knowledge that Samy planned to join ISIS as a fighter. But a person can provide material support to a terrorist organization by helping another person travel to Syria to join that organization without knowing that the person's actions *were* intended to influence or affect government conduct. Here, Mr. El Gammal's casual statements reflect, at best, a desire for regime change in Egypt and in other countries in the region. They hardly show that Mr. El Gammal intended for his conduct to influence or affect specific government conduct, or that he knew that Mr. El-Goarany intended to influence or affect any particular government conduct through his travels.

Instead, the examination of the facts demonstrates that no such finding is possible because under the government's theory the enhancement would apply to any support that a defendant provided to any ISIS sympathizer. As seen from *Alhaggagi*, a generalized argument that ISIS seeks to coerce or intimidate governments is insufficient.

Thus, the application of § 3A1.4's terrorism enhancement constituted procedural error and Mr. El Gammal's appellate counsel was ineffective for failing to raise it on appeal.

C.   **The U.S.S.G. § 2M5.3 (b)(1) Enhancement Does Not Apply Because the Evidence Does Not Show that Any Material Support Would Be in Furtherance of a Violent Act.**

Under U.S.S.G. § 2M5.3(a), the base offense level for providing material support to a designated terrorist organization is 26.  U.S.S.G. § 2M5.3(a). U.S.S.G. § 2M5.3(b)(1) provides for a 2-level increase to 28 as a "specific offense characteristic" if "the offense involved the provision of ... material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act." U.S.S.G. § 2M5.3(b)(1). See *United States v. Dhirane*, 896 F.3d 295, 304 (4th Cir. 2018) (Section 2M5.3(b)(1)(E) requires "that the defendants be shown to have intended, known, or had reason to believe that their support would be used to assist in acts of violence by the terrorist organization.")

Here, the Court found that "it could be easily established by a preponderance of the evidence…that Mr. El Gammal engaged in this activity with Mr. El-Goarany knowing that Mr. El-Goarany was very incentivized to travel to Syria in order to fight, to become a fighter with ISIL, an organization that has been deemed to be a foreign terrorist organization, an organization that had declared war against the United States and others and that Mr. El Gammal knew that Mr. El-Goarany was going to willingly engage in acts of violence." [Sentencing Transcript, pp. 11-12.]

First, this reasoning is flawed because the fact that ISIS was a foreign terrorist organization cannot be the only basis for determining that § 2M5.3(a) applied to Mr. El Gammal's case.  As defense counsel argued at sentencing, this interpretation of the sentencing enhancement would lead to the result that *all* material support offenses would qualify an enhancement under U.S.S.G. § 2M5.3(a). Congress could not have intended this outcome for a sentencing *enhancement*.

Rather, the enhancement only applies after a showing that the support provided by the defendant was specifically intended to support violence. For example, in *United States v. Dhirane*, 896 F.3d 295, 304–05 (4th Cir. 2018), the court affirmed the district court's application of the sentencing enhancement after finding that al-Shabaab was engaged in terrorist activities in fighting

wars in Somalia and Kenya and the defendants "engaged the leaders of al-Shabaab to learn of and respond to specific needs arising 'as a result of [al-Shabaab] military operations.'" *Id.* Additionally, the Fourth Circuit noted the district court's finding that "defendants 'coordinated to some degree their fundraising' with those specific needs" and concluded that the district court had "sufficient evidence" to apply the standard "*[b]ecause* the defendants' financial support was directed and designed to support al-Shabaab's military operations in fighting a war of terrorism in Somalia and Kenya" *Id.* at 305.

The evidence in this case falls far short. Again, the government's proof encompassed broad general statements of support by Mr. El Gammal for ISIS while evidence that suggests that Mr. El Gammal knew that Mr. El-Goarany was planning to go to Syria to engage in violence is wholly lacking. Mr. El-Goarany's public story was that he was going to Syria to provide humanitarian aid to civilians and refugees escaping the Assad regime. The evidence established that Samy hid his desire to fight for ISIS from his parents, as well as from his friends, Khalafalla Osman and Rameez Farooqi. While Tarek El-Goarany testified that Samy explicitly told him he wanted to fight for ISIS and that Samy shared "certain things" with their cousin, Ahmed El-Goarany, there was no evidence presented at trial that Samy's true purpose was shared with anyone beyond this tight-knit family group.

The conversations that the government points to between Mr. El Gammal and Mr. El-Goarany do not establish that Mr. El Gammal understood the nature of Mr. El-Goarany's mission. Instead, the government's argument is conclusory and assumes that the only reason Mr. El-Goarany could possibly be going to Syria was to serve as a fighter:

> First, Mr. El Gammal certainly knew that Mr. el-Goarany was going to join ISIS. He knew that he was going to do so in Syria which is a war zone. And he knew that he was going to do so in order to be fighter. That is the only reason why young men from around the world were at this time flocking to Syria to join ISIS.

Based on this argument by the government, anyone who joined ISIS would automatically be eligible for the enhancement. But certainly, some individuals joined ISIS intended to serve in non-violent roles and were motivated to join by its messaging of a religious utopia rather than an intention to bear arms.

Because no evidence was introduced establishing that Mr. El Gammal was aware that Samy El-Goarany intended to engage in violent acts by going to Syria, this enhancement was applied in error.

### D. Mr. El Gammal's Appellate Counsel's Failure to Raise Challenges to U.S.S.G. §§ 3A4.1 and 2M5.3 (b)(1) on Appeal Constituted Ineffective Assistance of Counsel

To establish ineffective assistance of appellate counsel, a petitioner must meet these same requirements. *See Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994). A petitioner may not prevail in such a claim simply by showing that appellate counsel omitted a nonfrivolous argument, as counsel is not obligated to raise every possible nonfrivolous argument. *Id*. However, a petitioner may prevail, where he can demonstrate that counsel omitted a significant and obvious issue, while pursuing issues on appeal that were "clearly and significantly weaker." *Id*. In assessing an attorney's performance, a reviewing court must judge counsel's conduct "on the basis of the facts of the particular case viewed as of the time of counsel's conduct, and may not use hindsight to second-guess his strategy choices." *Id*. (internal quotations and citations omitted). The court's prejudice inquiry, however, "may be made with the benefit of hindsight." *Id*. at 534.

Defense counsel's failure to object to sentencing enhancements that were applied in error constitutes ineffectiveness of counsel where there is a "reasonable probability" that but for counsel's errors the sentence would have been different. *See Johnson v. United States*, 313 F.3d 815, 818 (2d Cir. 2002); *Cobb v. United States*, No. 04-CR-203 (ARR), 2019 WL 2607002, at *3 (E.D.N.Y. Jan. 11, 2019). Furthermore, any possible increase in jail time is sufficient to establish prejudice. *See Glover v. United States,* 531 U.S. 198, 203 (2001)(holding that "any [increase in the]

39

amount of actual jail time" due to Sentencing Guideline errors, constitutes prejudice under the *Strickland* doctrine.)

Appellate counsel's failure to advance claims on appeal that the district court had committed procedural error in sentencing cannot be considered sound strategy. These arguments related to enhancements had vociferously been made at the district court level and were therefore preserved. Because the district court failed to make the requisite factual findings justifying the imposition of these enhancements, Second Circuit precedent makes clear that the Circuit would have remanded the case to the district court if appellate counsel had raised them. Notably, in doing so, appellate counsel disregarded Mr. El Gammal's request that these sentencing enhancement arguments be made on his behalf in the direct appeal. [See Exhibit A.]

Further, these arguments would not have detracted from the other arguments counsel sought to raise concerning certain trial court evidentiary rulings and jury instructions because these arguments related to sentencing and would not have been inconsistent with counsel's strategy to attack the fairness of the trial, as a whole.

That said, appellate counsel arguments on appeal were significantly weaker because they pertained to discretionary evidentiary matters and the Second Circuit easily dismissed them as unmeritorious. As the Second Circuit noted in its decision, dismissing the appeal, "We have explained that "[t]he bar for authentication of evidence is not particularly high." *United States v. El Gammal*, 831 F. App'x 539, 541-42. (2d Cir. 2020). Similarly, the appellate court easily rejected defense counsel's argument that this Court erred in admitting records under the business judgment exception to the rule against hearsay as "without merit." *Id.* at 543.The court found that there was ample testimony that the witness who testified as a custodian of admitted Facebook records was "plainly a 'qualified witness'" to testify about the records that defense counsel was challenging. *Id.*

In contrast, the sentencing enhancements raised real concern. In particular, § 3A4.1 resulted in a sharp increase to Mr. El Gammal's sentence.  Because the evidence adduced at trial did not

support imposition of these enhancements, a reasonable probability exists that had appellate counsel raised these arguments on appeal, Mr. El Gammal's sentence would have been different. This Court sentenced the Petitioner to 144 months' imprisonment on Counts One and Two, 120 months' imprisonment on Count Three, and 60 months' imprisonment on Count Four, all run concurrently. Without the enhancements, the advisory Guidelines range would have been 63-78 months. This advisory Guidelines range would have certainly let to a shorter sentence on Count One. Even if the Court imposed the same 120-month sentence on Count Three, and the same 60-month sentence on Count Four, run concurrently, the total sentence would have been 120 months, two years less than the sentence the Court imposed.

In fact, the much lower advisory Guidelines range may have led the Court to anchor its sentence within this lower range, and to consider a fine, instead of a term of imprisonment, on Count Three, resulting in a significantly lower sentence. In light of the real impact of the enhancements on Mr. El Gammal's carceral sentence, counsel's failure to appeal the application of these sentencing enhancements meets both prongs of *Strickland* because it was both ineffective and prejudicial.

## **CONCLUSION**

For all of the above-stated reasons, the Court should grant the writ, and order that the Petitioner's conviction on Count Three and Four be vacated, and order re-sentencing on Counts One and Two.

Dated: May 3, 2022

Respectfully submitted,

*Sarah Kunstler*

Sarah Kunstler
Beena Ahmad

LAW OFFICES OF SARAH KUNSTLER
Attorneys for AHMED EL GAMMAL
315 Flatbush Avenue #103
Brooklyn, NY 11217
718-783-3682 (office)
347-402-2014 (fax)
sarah@kunstlerlaw.net


CC:   AUSA Brendan F. Quigley, Esq.
      AUSA Negar Tekeei, Esq.
      AUSA Andrew J. DeFelippis

      Ahmed El Gammal

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    -v-

AHMED EL GAMMAL,

        Defendant.

15-CR-00588 (ER)
**DECLARATION**

---

JEREMY GUTMAN declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am an attorney admitted to practice in the Southern District New York.

2. On March 29, 2019, I was assigned to represent Ahmed El Gammal in his appeal of his conviction and sentence in the above-captioned case.

3. I understand that Mr. El Gammal is filing a petition pursuant to 28 U.S.C. § 2255(a), and that he argues that I was ineffective for failing to challenge his convictions on Counts Three and Four on the ground of insufficiency and for failing to challenge the 12-point enhancement under U.S.S.G. § 3A4.1 and the two-point enhancement under U.S.S.G. § 2M5.3 (b)(1).

4. Mr. El Gammal did, in fact, express interest in raising these issues in his appeal. It was my decision, based on my professional judgment, not to raise them.

5. To the extent that Mr. El Gammal has waived the attorney-client privilege in raising these issues, I ask that the waiver be narrowly construed to permit me to address issues relevant to his petition, and that the privilege otherwise be preserved.

April 22, 2022

New York, NY

Respectfully Submitted,

JEREMY GUTMAN
Attorney at Law